## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PAUL GARCIA-RYAN;

                Plaintiff,

v.

COMMUNITY HEALTH
PROJECT, INC. d/b/a CALLEN-LORDE
COMMUNITY HEALTH CENTER;

                Defendant.

Civ. No. 1:24-cv-7117

**COMPLAINT**

JURY TRIAL FOR
DAMAGES

Plaintiff Paul Garcia-Ryan ("Plaintiff"), by and through his undersigned attorney of record, alleges for his Complaint against Community Health Project, Inc., d/b/a Callen-Lorde Community Health Center ("Defendant") as follows:

### PRELIMINARY STATEMENT

1.    This is an action against Defendant for discrimination in medical judgment and treatment on the basis of sex and sexual orientation in violation of Section 1557 of the Patient Protection and Affordable Care Act ("the ACA"), 42 U.S.C. § 18116.

2.    Plaintiff subjected to "gender transition" interventions from Defendant from November 2014 until November 2022 to treat Gender Dysphoria, a psychiatric condition included in the Diagnostic and Statistical Manual of Mental Health Disorders, version 5

1

(DSM-5). In broad terms, "gender dysphoria" describes the psychological condition of a strong feeling of incongruence between one's sex and one's gender.

3.    At no point during this period did Defendant undertake to make a diagnosis or perform a comprehensive mental health assessment. Consequently, Defendant did not uncover that Plaintiff was suffering from internalized homophobia, a psychiatric condition that may manifest uniquely in same sex attracted persons. Internalized homophobia may mimic gender dysphoria.

4.    Internalized homophobia is the mental health condition in which familial and societal disapproval of homosexuality generates a strong sense of shame and becomes self-loathing. As a result, the person may have low self-esteem, and low acceptance of physical appearance. It may be accompanied with emotional distress, depression, and anxiety.

5.    Internalized homophobia describes the primary motivation for ego dystonic homosexuality, a condition where a person wishes to have a different sexual orientation.

6.    Internalized homophobia is a counter-indicator to medicalized gender transition,

7.    Defendant missed Plaintiff's internalized homophobia, because it failed to conduct an initial assessment for the purpose of making a diagnosis and performing differential diagnosis, and therefore denied Plaintiff the benefits of healthcare on the basis of sex and sexual orientation, and inflicted him with unnecessary and harmful medical interventions.

8.    Defendant reinforced Plaintiff's internalized homophobia and his baseless expectation that gender transition will resolve his psychological issues, and *de facto* converted a gay man to transgender.

9. Defendant *de facto* converted a gay man to transgender because it viewed all mental health issues through the transgender lens.

10. Defendant acted upon Plaintiffs self-report and self-diagnosis, and despite its legal obligations, Defendant deliberately failed to take patient history, assess, consider, or distinguish psychiatric conditions that mimic gender dysphoria, but in fact are not.

11. Defendant's actions contradicted generally accepted clinical guidelines, which it had removed from its practice some time prior to 2010.

12. Defendant's policies were motivated by political beliefs, and unsupported by empirical evidence.

13. Through this experimental and untested clinical practice, Defendant encouraged and unduly influenced Plaintiff's pursuit of gender transition that was motivated by the false belief that he was born in the wrong body, and with unrealistic and groundless expectations of what he would gain from transitioning.

14. Defendant disregarded warning signs, less risky alternatives, and carried on with its experimental and untested clinical practice even after Plaintiff's condition worsened.

15. Defendants baselessly approved Plaintiff for castration as a medically necessary treatment.

16. Defendant's deliberate failure to explore Plaintiff's responses to and emotions about his sexual orientation and their relationship to Plaintiff's "gender identity," and its encouragement of Plaintiff to transition medically, has caused, known and unknown, irreparable and irreversible physical and psychological injury to Plaintiff.

17. Plaintiff seeks compensatory and expectancy damages for direct actual damages for

trauma, cognitive harm, and physical harm, including disfigurement and deprivation of penis and testicles, loss of reproductive capacity, loss of enjoyment of sexual relations, ongoing health complications resulting from the treatments, and pain and suffering caused by his physical injuries.

18.    Plaintiff also seeks attorney's fees and costs pursuant to 42 U.S.C. § 1988(b).

## PARTIES

19.    Plaintiff Paul Garcia-Ryan resides in Brooklyn, New York and resided there while receiving care from Defendant.

20.    Defendant Community Health Project, Inc., d/b/a Callen-Lorde Community Health Center has, at all relevant times, had its principal place of business in New York, New York, and provided medical services to Plaintiff in New York. Defendant is a Federally Qualified Health Center ("FQHC") and has received Federal funding during all relevant periods.

## JURISDICTION AND VENUE

21.    An action arising under the ACA Section 1557, 42 U.S.C. § 18116, presents questions of federal law. Jurisdiction is proper under 28 U.S.C. § 1331.

22.    Venue is proper within this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because the Defendant's principal place of business is in New York, New York and the conduct underlying the Plaintiff's claims occurred in New York, New York, which is situated within the district boundaries of the U.S. District Court for the Southern District of New York.

## STATEMENT OF FACTS

23.    Based on information and belief, prior to 2010, Defendants rejected the generally accepted clinical guidelines for gender transition, known as "gate-keeping" which included

safety protocols such as a comprehensive mental health assessment and an evaluation of the patient's comfort with his sexual orientation.

24.    Defendant replaced the generally accepted guidelines with a self-invented model of practice called "informed consent," which largely relies on patient's self-diagnosis, self-report, clinical interpretations and determinations, without considering that patient self-diagnosis may be the result of confusion or misunderstanding of medically defined terms. It is the healthcare provider's responsibility to verify the patient's self-diagnosis. Patients do not possess the requisite knowledge and skills to differentiate among similar conditions.

25.    There is no evidence that a patient's permission to receive a treatment is a safe and effective replacement for assessment, diagnosis, and treatment provided by a team of appropriately trained and licensed healthcare professionals.

26.    Informed consent, even if adequate, does not mean that patients can insist upon whatever they might want without regard to its medical suitability.  Unlike purely commercial consumption activities, healthcare has boundaries and physicians are not mere dispensers of medicine without responsibility.

27.    Defendant lacks the requisite qualifications to develop standards of care.

28.    Defendant's change of policy was motivated by political beliefs that (1) conflate the right to access healthcare with the patient's right to self-determination; (2) equate self-determination with promotion of well-being and harm reduction; and (3) view protective procedures intended to minimize harm, such as making a differential diagnosis, as discriminatory against transgender patients.

29.   Defendant's political beliefs denigrate the "do no harm" principle. A differential diagnosis is essential to protecting patients who suffer from conditions that mimic Gender Dysphoria, but in fact are not, from the irreversible and harmful effects of gender medicine.

30.   Defendant's political beliefs which motivate its rejection of the necessity to make a differential diagnosis is discriminatory against gays and lesbians, because they are often gender non-conforming from a young age and often suffer censure from both family and society, thus placing them at risk of developing internalized homophobia which can mimic gender dysphoria. These gender non-conforming persons are unlikely to benefit from gender medicine, which has harmful and irreversible psychological and physical effects.

31.   On November 4, 2014, Plaintiff visited Defendant clinic for the first time and continued receiving care from Defendant through October 2022.

32.   During the initial visit, Plaintiff reported that he had already been taking hormones since 2010, and requested prescriptions for anti-androgen drugs and cross-sex hormones.

33.   Defendant elicited minimal history of Plaintiff's report of gender dysphoria and hormone therapy.  A detailed psycho-social history would have revealed that previous providers baselessly reinforced and encouraged Plaintiff's unscientific belief that he was born in wrong body, and that Plaintiff had come to believe this falsehood as an adolescent due to having been the target of bullying for his effeminate expression as a child, and his subsequent confusion and lack of adequate information about sexuality and sexual orientation, and his fear and anxiety about the social implications of being gay.

34.   Defendant did not request Plaintiff's psychological records or a letter from his psychologist supporting a diagnosis of Gender Dysphoria.

35.    Defendant did not make an initial assessment of Plaintiff's condition for the purpose of making its own diagnosis of Gender Dysphoria.

36.    Defendant accepted Plaintiff's report of diagnosis and treatment as accurate, and thereby continued interventions on Plaintiff based on the erroneous practices of Plaintiff's previous healthcare providers whose records it did not try to obtain and review for adequacy.

37.    Defendant was not alarmed by and did not seek to understand Defendant's identification as heterosexual on his intake form.

38.    Defendant failed to monitor Plaintiff's health, in particular, did not assess and monitor Plaintiff's reports of "mental fog" and feeling "emotionally unhinged."

39.    Defendant did not evaluate and assess whether Plaintiff understood his clinical situation. Defendant did not assess whether Plaintiff's "mental fog" affected his understanding of the risks and benefits of his treatment.

40.    Defendant's provision of access to hormone therapy continued the baseless affirmation of Plaintiff's purported "gender identity" with subsequent adverse health consequences.

41.    In March 2016, Defendant baselessly issued two remarkably similar letters approving Plaintiff for the removal of his testicles and the inversion of his penis, without performing a readiness assessment. Defendant had an informal policy communicated to its staff to issue approval letters without "gate-keeping".

42.    During the period of treatment leading up to the approval letters, Defendant did not perform differential diagnosis, perform a comprehensive mental health assessment, acquire any

understanding of Plaintiff's motivations and expectations, or discuss potential social, psychological, sexual, or health consequences of surgery.

43.    Defendant did not explore Plaintiff's sexuality or comfort with his sexual orientation despite Plaintiff's report of having male sexual partners while claiming to be heterosexual.

44.    Internalized homophobia can be a motivator for seeking gender transition. It is also a leading cause of transition regret.

45.    It is self-evident that a biological male who has a pattern of attraction and sexual activity with other biological males is homosexual and not heterosexual. However, the implications of the "homosexual" label cannot be underestimated when the individual has suffered environmental rejection precisely because of that identification and label. That label and its associated social disapprobation may be avoided by changing either one's sexual orientation or by one's gender.

46.    Historically, some societies forced conversion of gay men to trans-feminine by forcing the use of cross sex hormones as a method of asexualizing them. Today, homophobic governments encourage this form of gay conversion which is sometimes coerced and sometimes "consented" to due to lack of accurate information about homosexuality and dissemination of misinformation that leads many gays and lesbians to believe that they were born in the wrong body. However, even in such a society a physician may screen out misinformed or confused gay men. *Why Iran is a Hub for Sex-Reassignment Surgery*, The Economist (Apr. 4th, 2019).

47.    The UN Independent Expert reported on this practice as "converting" or "neutralizing" sexual orientation. The Independent Expert stated that medical or surgical gay conversion practices "can amount to cruel, inhuman or degrading treatment" under the

8

Convention Against Torture, and also violate the right to non-discrimination and the right to health. Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity, A/HRC/44/53 (15 June-3 July 2020), ¶¶ 49, 59-65.

48.    Sexual orientation is immutable, therefore distorting language can become seductive to those who are seeking to escape. Language is distorted when sex and sexual orientation are defined by reference to gender instead of sex. Changing the language typically used creates the possibility to use the socially accepted label of heterosexual and offers the superficial and unscientific explanation that the gay man was born in the wrong body. It is the healthcare provider's duty  to assess the patient's condition accurately.

49.    The APA Report on Therapeutic Responses to Sexual Orientation (2009) notes that while sexual orientation does not change, sexual orientation identity may shift, and therapists should provide a safe space for exploration of the self, and provide targeted treatments that address personal beliefs, feelings of shame, and "self-stigma."   The APA Report supports affirmation of sexual orientation when a patient seeks to change his sexual orientation.

50.    Through inappropriate affirmation and unnecessary hormone therapy, which can have adverse psychological and cognitive effects, and issuing baseless approval letters, Defendant exercised undue influence and led Plaintiff through the transition process which has irreversibly harmed Plaintiff's mind and body.

51.    Defendant's issuance of two letters approving Plaintiff for castration without a readiness assessment, has directly caused unconscionable, irreparable and irreversible physical and psychological harm to Plaintiff, including, but not limited to, genital mutilation, sexual dysfunction, and trauma.

52.   But for the approval letters issued by Defendant, no surgeon would have ablated Plaintiff's penis and testicles.

53.   Defendant knowingly, recklessly, and callously reinforced a gay man's internalized homophobia and assumed that he was transgender, and thereby neutralized his sexuality and sexual orientation. Defendant despicably repeated and revived the historical oppression of the "insular and discrete minority" of effeminate gay men who have been historically rejected and discriminated against not only on the basis of their sexual orientation, but also on the basis of their effeminate expression.

54.   As a result of the unnecessary interventions approved by Defendant, Plaintiff has suffered multifarious physical and psychological harms. Defendant has forever eliminated Plaintiff's ability to express himself and lead his life as a gay man.   The physical changes induced by Defendant's unnecessary and irrelevant treatments are permanent and irreversible.

55.   With maturation, change in medication, and more knowledge of psychology and sexuality, Plaintiff went through a long and emotionally challenging process of reflection to understand himself and his situation.   By April 2021, it became clear to Plaintiff that he was a gay man and that he was harmfully misled by his healthcare providers who "transitioned" him without examining his motives and expectations.

## CAUSE OF ACTION

### Violation of Section 1557 of the Affordable Care Act
### *Prohibition on Discrimination in Healthcare: 42 U.S.C. § 18116*

56.   Plaintiff incorporates all allegations of this Complaint by reference as if set forth in full herein.

57.    Defendant is a recipient of Federal funding and has been at all relevant times, and thus is subject to ACA Section 1557.  It is not relevant to determine which part of its programs or activities received or receive Federal funding because receipt of any Federal financial assistance for any program or activity makes the statute applicable.

Section 1557 of the ACA, 42 U.S.C. § 18116(a) provides:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

58.    By incorporating title IX by reference, the statute prohibits denial of benefits of healthcare, or otherwise subjecting a person to discriminatory treatment "on the basis of sex", because title IX prohibits discrimination on this "ground." 20 U.S.C. § 1681(a).

59.    Sexual Orientation is a subset of the class of sex. Discrimination on the basis of sexual orientation "necessarily entails discrimination on the basis of sex." *Bostock v. Clayton County*, 590 U.S. 644, 140 S. Ct. 1731, 1747 (2020). *See also Hively v. Ivy Tech Cmty. Coll.*, 853 F.3d 339 (7th Cir. 2017).  This rationale is equally applicable in the context of healthcare.

60.    Internalized homophobia is a sex-based condition, which may cause discomfort with the person's own sex, ie, gender dysphoria, and not just his sexual orientation.

11

61.    In determining whether a conduct, practice, or treatment is discriminatory, consideration must be given to sex specific characteristics and conditions. *See Newport News Shipbuilding & Drydock Co. v. EEOC*, 462 US 669, 676-78, 103 S.Ct. 2622 (1983). The law is not "blind" to healthcare needs that are associated with "unique sex-based characteristics." *Erickson v Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1271 (W.D. Wash. 2001).

62.    The central inquiry in determining whether a healthcare provider subjected the patient to discriminatory treatment in healthcare is whether the healthcare provider's actions or omissions caused harm on the basis of sex, taking into account sex specific conditions relevant to the treatment.

63.    Discrimination in the context of medical treatment is distinct from a claim of negligence arising from flawed medical judgment, and often arises under the Americans with Disabilities Act ("ADA") or the Rehabilitation Act ("RA").   The Second Circuit Court of Appeals has held that "a plaintiff pleads an actionable claim of discrimination" under the ADA or the RA, if he alleges that the defendant inflicted or withheld a medical treatment based on factors and for reasons not relevant to the suitability of the treatment. *McGugan v. Aldana-Bernier*, 752 F.3d 224, 231-34 (2d Cir. 2014).

64.    In application of the ACA Section 1557, it is unsettled whether a single standard of liability applies or whether the standard should vary based on the ground that discrimination is alleged.

65.    The Sixth and the Ninth Circuit Courts of Appeals have held that to state a claim under Section 1557, plaintiff must allege facts adequate to state claim under the corresponding statute that supplies the "ground" for discrimination. *Doe v CVS Pharm, Inc.*, 982 F.3d 1204,

1210 (9th Cir. 2020) *citing Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 238 (6th Cir. 2019).

66.     In contrast with *Doe*, in *Rumble v. Fairview Health Servs*, 2015 U.S. Dist. LEXIS 31591 (D. Minn. 2015) and in *Jolley v. Riverwoods Behavioral Health, LLC*, 2021 WL 6752161, at *5 (N.D. Ga. Aug. 30, 2021), *citing Nix v. Advanced Urology Inst. of Georgia, P.C.*, No. 1:18-CV-04656-SDG, 2020 WL 7352559, at *3 (N.D. Ga. Dec. 14, 2020), *aff'd sub nom. Nix v. Advanced Urology Inst. of Georgia, P.C.*, No. 21-10106, 2021 WL 3626763 (11th Cir. Aug. 17, 2021), *cert. denied*, 142 S. Ct. 1670 (2022), the Courts adopted the single standard principle, because applying different standards to the same statute would "lead to an illogical result." *Rumble* at *29.

67.     In this District, in a case alleging sex discrimination in an employee benefit plan, the Court held that "the standard and burden of proof for a discrimination claim under Section 1557 changes depending upon the type of discrimination alleged and should be drawn from the relevant statute listed in 42 U.S.C. § 18116(a)." *Weinreb v. Xerox Bus. Servs., LLC*, 323 F. Supp. 3d 501, 519 (S.D.N.Y. 2018).

68.     Title IX covers discrimination in a variety of settings from employment to athletics, harassment, and disciplinary hearings. Each setting has merited its own standard of liability suitable to its particular features. The Seventh Circuit has reasoned that that there is "no need to superimpose doctrinal tests on the statute." *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). The purpose of the tests is to provide a method for showing discrimination, however, the question can be posed directly, if taken as true, do the alleged facts prove discriminatory conduct and intent? *Ibid.*

69.    Plaintiff submits that the *McGugan* test sets the appropriate standard of liability for claims under the ACA when discrimination has occurred in the course of medical treatment regardless of the "ground" for discrimination. It is rational to apply the same standard to discriminatory conduct under the same circumstances, i.e., in the course of medical treatment, regardless of the ground for discrimination, because healthcare providers are fiduciaries and medical decisions have boundaries of reasonableness derived from the medical sciences.   The core question in such context is whether the healthcare provider's judgment related to a protected characteristic was objectively reasonable. *Bragdon v. Abbott*, 524 U.S. 624, 648-650, 118 S. Ct. 2196 (1998).

70.    Alternatively, the title IX setting that is most analogous to discrimination in the context of medical treatment is harassment, because in both instances a claim is made against the institution for discriminatory conduct of individuals over whom it exercises control, and further, clinics like schools have a duty of care to those in their care.

71.    To establish a claim of discriminatory intent in harassment cases under title IX, a plaintiff must show that the defendant had (1) actual notice of the discriminatory conduct, (2) authority to take corrective measures, and (3) was deliberately indifferent toward the discriminatory conduct. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S. Ct. 1989 (1993); *Davis v. Monroe Cty. Sch. Bd.*, 526 U.S. 629, 633, 646, 119 S. Ct. 1661 (1999).

72.    Defendant, knowingly and willingly, removed the safety protocol that called for assessment of the patient's comfort with his sexual orientation, and implemented a no gate-keeping policy in its provision of gender medicine.

73.    Defendant failed to consider a sex based affliction of Plaintiff relevant to the "treatments" it dispensed and approved of. Defendant did not carry out differential diagnosis and did not assess Plaintiff for internalized homophobia. The act of differentiating is the responsibility of the healthcare provider and not of the patient.

74.    Defendant's acts and omissions were the result of political beliefs that relieved physicians from their ethical and legal duties to minimize the risk of harm, and turned them into mere intermediaries for prescribing medications and issuing surgery approval letters.

75.    Defendant's failure was also the result of its erroneous political belief that safety protocols in gender medicine are discriminatory, and that gender medicine should be available without a comprehensive assessment and differential diagnosis, and without regard to the extreme harm it may cause to others, in particular to gays and lesbians.

76.    Defendant disregarded studies that indicated internalized homophobia leads to transition regret, and the APA recommendation that gays and lesbians seeking to change their sexual orientation should be affirmed as gay or lesbian.

77.    Defendant had knowledge of the risk of harm to gays and lesbians and nonetheless proceeded to remove safety protocols with deliberate indifference toward their safety.

78.    Defendant knowingly and willingly acted with medically irrelevant motives and with deliberate indifference toward Plaintiff's sex and sexual orientation, therefore the standard of liability for title IX is satisfied.

79.    Defendant's conduct violated Section 1557's prohibition on discrimination on the basis of sex. An intentional violation of the ACA's nondiscrimination provision on the ground of

sex entitles a plaintiff to compensatory damages. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75, 112 S. Ct. 1028 (1992); *see also Cummings v. Premier Rehab Keller,* 596 U.S. 212, 142 S. Ct. 1562, 1571 (2022).

## REQUEST FOR JURY TRIAL FOR DAMAGES

Pursuant to Fed. R. Civ. P. 38(c), Plaintiff requests a trial by jury for the specific issue of damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief for damages caused by Defendant's breach of its nondiscrimination obligation, as follows:

1. Compensatory damages for the following direct actual damages:

    1. past and future medical expenses;

    2. unnecessary lifelong medical dependence;

    3. loss of penis and testicles;

    4. disfigurement;

    5. sterilization;

    6. latent harm;

    7. trauma;

    8. cognitive injury;

    9. loss of enjoyment of sexual relations; and

    10. pain and suffering on account of physical injury.

2. Attorney's fees and costs under 42 U.S.C. § 1988(b).

3. Such other relief as the Court deems just and proper.


Respectfully submitted,

Paul Garcia-Ryan

By his Attorney,

Dated: September 19, 2024

*/s/ Mitra N. Forouhar*
Mitra N. Forouhar (NY Bar No. 2435683)
77 Van Ness Ave. Ste 101
PMB 1319
San Francisco, CA 94102
mitra@mnf-law.com
(415) 602-1864